# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLORADO

<table>
<tr><td>

J.P.P.,

      Plaintiff,

      v.

U.S. DEPARTMENT OF HOMELAND SECURITY;
Kristi NOEM, Secretary, U.S. Department of Homeland
Security, in her official capacity; Pamela BONDI, U.S.
Attorney General, in her official capacity; and Dawn
CEJA, Warden, Aurora Contract Detention Facility, in
her official capacity.

      Defendants.

</td><td>

Case No. _____




**COMPLAINT**

</td></tr>
</table>

## INTRODUCTION

1.      Plaintiff is a noncitizen asylum seeker currently in detention at United States Immigration and Customs Enforcement's ("ICE") contract detention facility in Aurora, Colorado. Plaintiff is at imminent risk of deprivation of liberty and deportation to a third country without the basic procedural protections of notice and opportunity to contest removal there based on a claim of fear, in violation of his constitutional, statutory, and regulatory rights, as well as a nationwide Temporary Restraining Order issued by District Judge Brian E. Murphy on March 28, 2025 in the putative class action lawsuit, *D.V.D. et al. v. U.S. Dep't Homeland Security et al*., No. 1:25-cv-10676 (D. Mass. 2025).

2.      Plaintiff has a final removal order resulting from proceedings in which he was notified he could be deported to Venezuela, his country of origin But Plaintiff faces imminent

1

risk under the policy or practice of the Department of Homeland Security (DHS) of deporting, or seeking to deport, noncitizens like him to a *third* country – a country *never* designated for removal – without first providing notice or opportunity to contest removal on the basis that they have a fear of persecution, torture, and even death if deported to that third country. Motions to reconsider, reopen, and/or stay the removal order are pending before the immigration court. Plaintiff has also repeatedly articulated his fear regarding removal to El Salvador to the ICE Denver Field Office in writing and demanded an opportunity to be heard but has received no substantive response.

3.    DHS' policy or practice of failing to afford these basic, minimal protections violates the Immigration and Nationality Act, the Foreign Affairs Reform and Restructuring Act of 1998, the Due Process Clause of the Fifth Amendment, and the treaty obligations of the United States. Indeed, the Office of the Solicitor General (OSG) recognized these legal obligations when it informed the Supreme Court in *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021), that DHS must provide a noncitizen with notice and an opportunity to present a fear-based claim before that noncitizen can be deported to a non-designated third country. *See* Transcript of Oral Argument at 20-21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021). DHS' failure to provide meaningful notice and an opportunity to present a fear-based claim before deportation to a third country has caused, and is causing, irreparable harm.

4.    Plaintiff challenges DHS' policy or practice of failing to provide meaningful notice and the opportunity to present a fear-based claim prior to deportation to a third country. Plaintiff asks this Court to declare these policies unlawful and to set them aside.

5.    Notwithstanding the Temporary Restraining Order in *D.V.D.*, Plaintiff has

reason to believe he will be imminently placed on a deportation flight to a Salvadoran prison known as the Center for Terrorism Confinement (CECOT), where conditions are notoriously brutal and intentionally torturous. Plaintiff has been told he may be removed <u>as early as this morning, April 2, 2025</u>. Plaintiff seeks an opportunity to pursue fear-based relief against removal to El Salvador or any other third country with whom the United States is currently pursuing third-party removal agreements. Plaintiff seeks preliminary and permanent injunctive relief restraining Defendants from failing to provide him with written notice and a meaningful opportunity to present a fear-based claim under 8 U.S.C. § 1231(b)(3) and/or the Convention Against Torture to an immigration judge prior to deportation to a third country.

## JURISDICTION

6.      This case arises under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, the regulations implementing the INA, the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105–277, div. G, Title XXII, § 2242(a), 112 Stat. 2681, 2681–822 (1998) (codified as Note to 8 U.S.C. § 1231), the regulations implementing the FARRA, the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*; and 5 U.S.C. § 552 *et. seq*.

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2241. The Court may grant declaratory and injunctive relief pursuant to 5 U.S.C. §§ 705-06, 28 U.S.C. § 1651, 28 U.S.C. §§ 2201–02, 28 U.S.C. § 2241, and its equitable powers. The government has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

## VENUE

8.      Venue properly lies in this District pursuant to 28 U.S.C. § 1391(e) because

this is a civil action in which one of the defendants is an agency of the United States, there is

no real property involved in this action, and Plaintiff J.P.P. resides in this District.

## PARTIES

9.      Plaintiff J.P.P.  is an asylum-seeker from Venezuela and resident of Denver,

Colorado. On February 25, 2025, J.P.P. received a removal order, as a result of his

involuntary and unknowing request. The immigration court issued a removal order on

February 25, 2025, in which Venezuela was the only country designated for removal. On

March 28, 2025, J.P.P., with the assistance of pro bono counsel, filed a Motion to Reconsider

and/or Reopen the removal order. That motion is pending before the immigration court. J.P.P.

currently faces imminent risk of deportation to a third country, including El Salvador, without

notice and before his case can be adjudicated.

10.      Defendant U.S. Department of Homeland Security (DHS) is the federal

agency responsible for implementing and enforcing the INA and is an agency within the

meaning of the APA, 5 U.S.C. § 551(1). DHS oversees its component agencies, including

ICE, U.S. Customs and Border Protection, and U.S. Citizenship and Immigration Services.

11.      Defendant Kristi Noem is the Secretary of DHS. In that capacity, she is

charged with the administration and enforcement of the INA. She is sued in her official

capacity.

12.      Defendant Pamela Bondi is the United States Attorney General. In this

capacity she directs agencies within the United States Department of Justice, including the

Executive Office for Immigration Review (EOIR), which houses the immigration courts

and Board of Immigration Appeals. Defendant Bondi is responsible for the administration

of immigration laws pursuant to 8 U.S.C. § 1103(g) and oversees EOIR. She is sued in her official capacity.

13.    Dawn Ceja is the Warden of the Aurora Contract Detention Facility, and she has physical custody of Plaintiff J.P.P. pursuant to the facility's contract with ICE to detain noncitizens. Ms. Ceja is a legal custodian of Plaintiff J.P.P. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

### I.    Legal Background

#### A.    Section 240 Removal Proceedings

14.    In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). The Act generally retained prior procedures for removal hearings for all noncitizens—i.e., full immigration court hearings, appellate review before the Board of Immigration Appeals, and federal court review. *See* 8 U.S.C. § 1229a; 8 U.S.C. § 1252(a). In these removal proceedings (commonly referred to as "Section 240" proceedings), the noncitizen is entitled to select a country of removal. 8 U.S.C. § 1231(b)(2)(A); *see also* 8 C.F.R. § 1240.10(f) ("[T]he immigration judge shall notify the respondent that if he or she is finally ordered removed, the country of removal will in the first instance be the country designated by the respondent. . . ."). The immigration judge (IJ) will designate the country where the person "is a subject, national, or citizen," if either the noncitizen does not select a country or as an alternative in the event the noncitizen's designated country does not accept the individual. 8 U.S.C. § 1231(b)(2)(D). The IJ also may designate alternative countries, as specifically set out by 8 U.S.C. § 1231(b)(2)(E).

15.     An IJ must provide sufficient notice and opportunity to apply for protection from a designated country of removal. 8 C.F.R. § 1240.10(f) (providing that the "immigration judge *shall* notify the respondent" of designated countries of removal) (emphasis added); 8 C.F.R. § 1240.11(c)(1)(i) (providing that the IJ shall "[a]dvise the [noncitizen] that he or she may apply for asylum in the United States or withholding of removal to [the designated countries of removal]").

16.     Asylum is a form of protection available in Section 240 removal proceedings. An IJ may grant asylum in the exercise of discretion where the applicant demonstrates a "well- founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" in their country of origin. 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A); *see also* 8 C.F.R. §§ 208.1, 1208.1. Once granted asylum, an individual generally cannot be deported to their country of origin or any other country absent subsequent unlawful conduct, evidence of fraud in the asylum application, or a fundamental change in country conditions. *See generally* 8 U.S.C. § 1158(c)(2); 8 C.F.R §§ 208.24, 1208.24.

17.     For individuals determined to be ineligible for asylum, Congress further provided, with certain exceptions not relevant here, that "notwithstanding [8 U.S.C. §§ 1231(b)(1) and (2)], the Attorney General [i.e., DHS] may not remove [a noncitizen] to a country if the Attorney General [(i.e., an immigration judge)] decides that [the noncitizen's] life or freedom would be threatened in that country because of [the noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. §§ 208.16, 1208.16. This form of protection, known as

withholding of removal, is mandatory, i.e., it cannot be denied to eligible individuals in the exercise of discretion. Unlike asylum, the protection of withholding of removal is country-specific.

18.　　Individuals in Section 240 proceedings who are ineligible for withholding of removal are still entitled to receive protection under the Convention Against Torture (CAT), in the form of withholding or deferral of removal, upon demonstrating a likelihood of torture if removed to the designated country of removal. *See* FARRA (codified as Note to 8 U.S.C. § 1231); 8 C.F.R. §§ 208.16(c), 208.17(a), 1208.16(c), 1208.17(a); 28 C.F.R. § 200.1. Like withholding of removal under 8 U.S.C. § 1231(b)(3), CAT protection is mandatory. *Id*. With respect to any individual granted deferral of removal under CAT, the IJ "shall also inform the [noncitizen] that removal has been deferred only to the country in which it has been determined that the [noncitizen] is likely to be tortured, and that the [noncitizen] may be removed at any time to another country where he or she is not likely to be tortured." 8 C.F.R. §§ 208.17(b)(2), 1208.17(b)(2).

19.　　An IJ may only terminate a grant of CAT protection based on evidence that the person will no longer face torture. DHS must move for a new hearing and provide evidence "relevant to the possibility that the [noncitizen] would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing." 8 C.F.R. §§ 208.17(d)(1), 1208.17(d)(1). If a new hearing is granted, the IJ must provide notice "of the time, place, and date of the termination hearing," and must inform the noncitizen of the right to "supplement the information in his or her initial [withholding or CAT] application" "within 10 calendar days of service of such notice (or 13 calendar days if service

of such notice was by mail)." 8 C.F.R. §§ 208.17(d)(2), 1208.17(d)(2).

20.    Individuals in Section 240 proceedings are entitled to an administrative appeal to the BIA along with an automatic stay of deportation while the appeal is pending, and to seek judicial review of an adverse administrative decision by filing a petition for review in the court of appeals. See 8 U.S.C. §§ 1101(a)(47)(B), 1252(a); 8 C.F.R. §§ 1003.6(a), 1240.15.

**B.    Statutory Scheme for Removal to a Third Country**

21.    Congress established the statutory process for designating countries to which noncitizens may be removed, 8 U.S.C. § 1231(b)(1)-(3).[1]

22.    Subsection (b)(1) applies to noncitizens "[a]rriving at the United States," including from a contiguous territory, but expressly contemplates arrival via a "vessel or aircraft." It designates countries and alternative countries to which the noncitizen may be removed. 8 U.S.C. § 1231(b)(1)(B) (removal to contiguous country from which the noncitizen traveled), § 1231(b)(1)(C) (alternative countries).

23.    Subsection (b)(2) applies to all other noncitizens, and like Subsection (b)(1), designates countries and alternative countries to which the noncitizen may be removed. 8 U.S.C.

---

[1] References to the Attorney General in Section 1231(b) refer to the Secretary of DHS for functions related to carrying out a removal order and to the Attorney General for functions related to selection of designations and decisions about fear-based claims. 6 U.S.C. § 557. The Attorney General has delegated the latter functions to the immigration courts and Board of Immigration Appeals. See 8 C.F.R. §§ 1208.16, 1208.17, 1208.31,1240.10(f), 1240.12(d). § 1231(b)(2)(A) (noncitizen's designation of a country of removal), 1231(b)(2)(B) (limitation on designation), 1231(b)(2)(C) (disregarding designation), 1231(b)(2)(D) (alternative country), 1231(b)(2)(D) (alternative countries), 1231(b)(2)(E) (additional removal countries).

24.     Critically, both Subsections (b)(1) and (b)(2), have a specific carve-out

provision prohibiting removal of persons to countries where they face persecution or torture.

Specifically, § 1231(b)(3)(A), entitled "Restriction on removal to a country where

[noncitizen's] life or freedom would be threatened," reads:

> **Notwithstanding paragraphs [b](1) and [b](2),** the Attorney General **may not
> remove** [a noncitizen] to a country if the Attorney General decides that the
> [noncitizen's] life or freedom would be threatened in that country because of the
> [noncitizen's] race, religion, nationality, membership in a particular social group, or
> political opinion.
> *Id*. § 1231(b)(3)(A) (emphasis added).

25.     Similarly, with respect to the Convention Against Torture, the

implementing regulations allow for removal to a third country, but only "where he or she

is not likely to be tortured." 8 C.F.R. §§ 208.17(b)(2), 1208.17(b)(2).

26.     In *Jama v. Immigr. & Customs Enf't*, the Supreme Court addressed the

designation procedure under Subsection (b)(2). 543 U.S. 335 (2005). Critically, the Court

stated that noncitizens who "face persecution or other mistreatment in the country designated

under § 1231(b)(2), . . . have a number of available remedies: asylum; withholding of removal;

relief under an international agreement prohibiting torture " *Jama*, 543 U.S. at 348 (citing 8

U.S.C. §§1158(b)(1), 1231(b)(3)(A); 8 C.F.R. §§ 208.16(c)(4), 208.17(a)).

27.     Although individuals granted CAT protection may be removed to a third

country, the regulations provide that they may not be removed to a country where they are

likely to be tortured: "The immigration judge shall also inform the [noncitizen] that removal

has been deferred only to the country in which it has been determined that the [noncitizen] is

likely to be tortured, and that the [noncitizen] may be removed at any time to another country

where he or she is not likely to be tortured." 8 C.F.R. §§ 208.17(b)(2), 1208.17(b)(2).

28.     Notably, the regulations also provide that protection under CAT may be terminated based on evidence that the person will no longer face torture but nevertheless provides certain protections to noncitizens. First, the regulations require DHS to move for a new hearing, requiring that DHS support their motion for the new hearing with evidence "relevant to the possibility that the [noncitizen] would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing. 8 C.F.R. §§ 208.17(d)(1), 1208.17(d)(1). Second, even if a new hearing is granted, the regulations require that the IJ provide the noncitizen with notice "of the time, place, and date of the termination hearing. Such notice shall inform the [noncitizen] that the [noncitizen] may supplement the information in his or her initial application for withholding of removal under the Convention Against Torture and shall provide that the [noncitizen] must submit any such supplemental information within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail)." 8 C.F.R. §§ 208.17(d)(2), 1208.17(d)(2). Thus, not only is the noncitizen provided notice, but also an opportunity to submit documentation in support of their claim for protection.

**C.     DHS' Obligation to Provide Notice and Opportunity to Present a Fear-Based Claim Before Deportation to a Third Country**

29.     For individuals in removal proceedings, the designation of a country of removal (or, at times, countries in the alternative that the IJ designates) on the record provides notice and an opportunity to permit a noncitizen who fears persecution or torture in the designated country (or countries) to file an application for protection. *See* 8 C.F.R. § 1240.10(f) (stating that "immigration judge shall notify the [noncitizen]" of proposed countries of removal); 8 C.F.R. § 1240.11(c)(1)(i) ("If the [noncitizen] expresses fear of

persecution or harm upon return to any of the countries to which the [noncitizen] might be
removed pursuant to § 1240.10(f) . . . the immigration judge shall . . . [a]dvise [the
noncitizen] that he or she may apply for asylum in the United States or withholding of
removal to those countries[.]").

30.    Pursuant to § 1231(b)(3)(A), courts repeatedly have held that individuals
cannot be removed to a country that was not properly designated by an IJ if they have a fear
of persecution or torture in that country. *See Andriasian v. INS*, 180 F.3d 1033, 1041 (9th Cir.
1999); *Kossov v. INS*, 132 F.3d 405, 408-09 (7th Cir. 1998); *El Himri v. Ashcroft*, 378 F.3d
932, 938 (9th Cir. 2004); *cf. Protsenko v. U.S. Att'y Gen.*, 149 F. App'x 947, 953 (11th Cir.
2005) (per curiam) (permitting designation of third country where individuals received
"ample notice and an opportunity to be heard").

31.    Providing such notice and opportunity to present a fear-based claim prior to
deportation also implements the United States' obligations under international law. *See* United
Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150;
United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223,
606 U.N.T.S. 267; Refugee Act of 1980, Pub. L. 96-212, § 203(e), 94 Stat. 102, 107 (codified
as amended at 8 U.S.C. § 1231(b)(3)); *INS v. Stevic*, 467 U.S. 407, 421 (1984) (noting that the
Refugee Act of 1980 "amended the language of [the predecessor statute to § 1231(b)(3)],
basically conforming it to the language of Article 33 of the United Nations Protocol"); *see
also* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading
Treatment or Punishment, *opened for signature* Dec. 10, 1984, art. III, S. Treaty Doc. No.
100-20 (1988), 1465 U.N.T.S. 85, 114; FARRA at 2681–822 (codified at Note to 8 U.S.C. §

1231) ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States."); United Nations Committee Against Torture, General Comment No. 4 ¶ 12, 2017, Implementation of Article 3 of the Convention in the Context of Article 22, CAT/C/GC/4 ("Furthermore, the person at risk [of torture] should never be deported to another State where he/she may subsequently face deportation to a third State in which there are substantial grounds for believing that he/she would be in danger of being subjected to torture.").

32.     Meaningful notice and opportunity to present a fear-based claim prior to deportation to a country where a person fears persecution or torture are also fundamental due process protections under the Fifth Amendment. *See Andriasian*, 180 F.3d at 1041; *Protsenko*, 149 F. App'x at 953; *Kossov*, 132 F.3d at 408; *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1004 (W.D. Wash. 2019). Similarly, a "last minute" IJ designation of a country during removal proceedings that affords no meaningful opportunity to apply for protection "violate[s] a basic tenet of constitutional due process." *Andriasian*, 180 F.3d at 1041.

33.     In 2005, in jointly promulgating regulations implementing 8 U.S.C. § 1231(b), the Departments of Justice and Homeland Security asserted that "[a noncitizen] will have the opportunity to apply for protection as appropriate from any of the countries that are identified as potential countries of removal under [8 U.S.C. § 1231(b)(1) or (b)(2)]." Execution of Removal Orders; Countries to Which Aliens May Be Removed, 70 Fed. Reg. 661, 671 (Jan. 5, 2005) (codified at 8 C.F.R. pts. 241, 1240, 1241) (supplementary information).

Furthermore, the Departments contemplated that, in cases where ICE sought removal to a country that was not designated in removal proceedings, namely, "removals pursuant to [8 U.S.C. § 1231(b)(1)(C)(iv) or (b)(2)(E)(vii)]," DHS would join motions to reopen "[i]n appropriate circumstances" to allow the noncitizen to apply for protection. *Id.*

34.    Furthermore, consistent with the above-cited authorities, at oral argument in *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021), the Assistant to the Solicitor General represented that the government must provide a noncitizen with notice and an opportunity to present a fear-based claim before that noncitizen can be deported to a non-designated third country. Specifically, at oral argument in that case, the following exchange between Justice Kagan and Vivek Suri, Assistant to the Solicitor General, took place:

> JUSTICE KAGAN: . . . [S]uppose you had a third country that, for whatever reason, was willing to accept [a noncitizen]. If -- if -- if that [noncitizen] was currently in withholding proceed -- proceedings, you couldn't put him on a plane to that third country, could you?

> MR. SURI: We could after we provide the [noncitizen] notice that we were going to do that.

> JUSTICE KAGAN: Right.

> MR. SURI: But, without notice --

> JUSTICE KAGAN: So that's what it would depend on, right? That -- that you would have to provide him notice, and if he had a fear of persecution or torture in that country, he would be given an opportunity to contest his removal to that country. Isn't that right?

> MR. SURI: Yes, that's right.

> JUSTICE KAGAN: So, in this situation, as to these [noncitizens] who are currently in withholding proceedings, you can't put them on a plane to anywhere right now, isn't that right?

> MR. SURI: Certainly, I agree with that, yes.

13

JUSTICE KAGAN: Okay. And that's not as a practical matter. That really is, as -- as you put it, in the eyes of the law. In the eyes of the law, you cannot put one of these [noncitizens] on a plane to any place, either the -- either the country that's referenced in the removal order or any other country, isn't that right?

MR. SURI: Yes, that's right.

*See* Transcript of Oral Argument at 20-21, *Johnson v. Guzman Chavez*, 594 U.S. 523 (2021).

35.    Notice is only meaningful if it is presented sufficiently in advance of the deportation to stop the deportation, is in a language the person understands, and provides for an automatic stay of removal for a time period sufficient to permit the filing of a motion to reopen removal proceedings so that a third country for removal may be designated as required under the regulations and the noncitizen may present a fear-based claim. *Andriasian*, 180 F.3d at 1041; *Aden*, 409 F. Supp. 3d at 1009 ("A noncitizen must be given sufficient notice of a country of deportation [such] that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation.").

36.    An opportunity to present a fear-based claim is only meaningful if the noncitizen is not deported before removal proceedings are reopened. *See Aden*, 409 F. Supp. 3d at 1010 (holding that merely giving petitioner an opportunity to file a discretionary motion to reopen "is not an adequate substitute for the process that is due in these circumstances" and ordering reopening); *Dzyuba v. Mukasey*, 540 F.3d 955, 957 (9th Cir. 2008) (remanding to BIA to determinate whether designation is appropriate).

**D.    DHS Routinely Violates Its Obligations to Provide Notice and Opportunity to Present a Fear-Based Claim Before Deportation to a Third Country**

37.    As a matter of policy or practice, DHS violates the statutory, regulatory, and due process framework by depriving Plaintiff of any notice, let alone meaningful notice, and

any opportunity, let alone a meaningful opportunity, to present a fear-based claim prior to deportation to a third country.

38.    Although DHS has a nondiscretionary duty to provide both these protections, DHS routinely fails to do so.

39.    DHS had no written policy to provide, or guarantee provision of, either of these protections, until March 30, 2025.

40.    DHS did not produce any policy in response to the FOIA request and subsequent litigation for such a policy in *Nat.'l Immigr. Litigation Alliance v. ICE*, No. 1:22-cv-11331-IT (D. Mass filed Aug. 17, 2022).

41.    In litigation involving a plaintiff who was removed to a third country after being granted withholding of removal to Cuba, DHS has admitted it has no policy to provide notice or an opportunity to apply for protection regarding removal to a third country. *See Ibarra-Perez v. United States*, No. 2:22-cv-01100-DWL-CDB (D. Ariz. filed Jun. 29, 2022). In both written discovery and two depositions of DHS witnesses conducted pursuant to Federal Rule of Civil Procedure 30(b)(6), the government repeatedly stated it has no obligation to provide written or oral notice if it intends to deport a noncitizen to a third county, and has no written policy requiring such written notice; instead, the government claimed that if such notifications are provided, they are usually oral. In addition, the government admitted it has no policy to ensure a noncitizen has an opportunity to seek fear-based protection from removal to a third country before that removal takes place.

42.    Nonetheless, DHS has, in a limited number of cases over the years, filed a motion to reopen removal proceedings to designate a new country and allow a noncitizen to

pursue a fear-based claim, demonstrating that it is aware of what should be done to provide a meaningful opportunity to seek protection prior to removal to a third country.

43.     DHS' routine failure to provide meaningful notice and opportunity to present a fear-based claim prior to deportation to a third country has led to hundreds of unlawful deportations, placing individuals at serious risk of persecution, torture, and/or death.

44.     On March 30, 2025, after the Complaint in *D.V.D.* outlined the above-described complete absence of a written policy to provide, or guarantee provision of, either notice or opportunity to apply for protection, DHS released a memorandum titled "Guidance Regarding Third Country Removals." The memorandum (hereinafter "the Guidance") states that when a third country has "provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured" and the Department of State "believes those assurances to be credible," then removal to that country can occur without any kind of written notice to the person who may be removed. If no such diplomatic assurances have been given, or the Department of State does not believe them to be credible, DHS will inform the person they may be removed to the third country, but will not ask affirmatively if they fear removal to that country. Only if the person raises fear unprompted will the person be referred for eligibility for protection under INA § 241(b)93) and CAT.

45.     The Guidance, issued on the same day that DHS sent another deportation flight to El Salvador, without disclosing the nationalities of any of the people on the plane or the legal basis for removal, plainly does not comply with DHS's own regulations.

C.F.R. § 1240.10(f) states that "immigration judge shall notify the [noncitizen]" of proposed countries of removal.

46.     The Guidance also violates a "basic tenant of constitutional due process: that individuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so they will have the opportunity to prepare and present relevant arguments." *Andriasian*, 180 F.3d. at 1042. Where the proposed third country has "provided [undisclosed] diplomatic assurances" that the Department of State, based on undisclosed criteria, considers "credible," the person who may be sent there has no opportunity to challenge the government's arbitrary determination and no opportunity to raise individual claims that *they,* particularly, may be persecuted or tortured.

47.     Even the proceedings laid out where such diplomatic assurances are lacking or determined not to be credible do not comply with the most basic due process protections. The Guidance bans immigration officers from affirmatively asking noncitizens if they fear being removed to the proposed third country. Mere designation of a country of removal, without any further ability to seek protection against removal to it, is insufficient to provide a fair hearing, especially where a person is unrepresented. *Kossov v. INS*, 132 F.3d 405, 408 (7th Cir. 1998).

## II.     Increased Third Country Deportation Efforts and Detentions in CECOT.

48.     Defendants have been in longstanding violation of their obligation to create a system to provide noncitizens with notice and an opportunity to present a fear-based claim to an immigration judge before DHS deports them to a third country.

49.     On information and belief, until January 20, 2025, the number of

individuals subjected to DHS' policy or practice was relatively small.

50.    Prior to taking office, the Trump Administration stated its intention to pressure

third countries to accept noncitizens ordered deported from the United States.[2]

51.    On January 20, 2025, President Trump signed an Executive Order, entitled

Securing our Borders, in which he instructed the Secretary of State, Attorney General, and

DHS Secretary to "take all appropriate action to facilitate additional international

cooperation and agreements, . . ., including [safe third country agreements] or any other

applicable provision of law." *See* Exec. Order No. 14165, 90 Fed. Reg. 8467, 8468 (Jan. 20,

2025).

52.    In early February, news outlets reported that Secretary of State Marco Rubio

visited several Central American countries to negotiate increased acceptance of noncitizens in

or arriving in the United States, including individuals with final removal orders.[3]

53.    On March 5, 2025, the New York Times reported: "[ICE leadership] are

considering deporting people who have been found to have a legitimate fear of torture in

their home countries to third nations, according to documents obtained by The New York

Times."[4]

---

[2] Julia Ainsley, *Incoming Trump Administration Plans to Deport Some Migrants to Countries Other Than Their Own,* NBC News (Dec. 5, 2024); Commonwealth of the Bahamas, *Statement from the Office of the Prime Minister on the Trump Administration Transition Team Proposal* (Dec. 5, 2024) (rejecting Trump transition team proposal to "to accept deportation flights of migrants from other countries").

[3] Camilo Montoya-Galvez, *Trump Eyes Asylum Agreement with El Salvador to Deport Migrants There*, CBS News (Jan. 27, 2025); Matthew Lee, *Guatemala Gives Rubio a Second Deportation Deal for Migrants Being Sent Home from the US*, AP News (Feb. 5, 2025).

[4] Hamed Aleaziz and Zolan Kanno-Youngs, *Frustration Grows Inside the White House Over Pace of Deportations*, N.Y. Times (Mar. 5, 2025).

54.     Since about January 20, 2025, on information and belief, DHS has dramatically increased the number of individuals being deported to a third country and being considered for deportation to a third country.

55.     On March 15, 2025, CNN reported that hundreds of people, mostly Venezuelan, were deported to El Salvador and imprisoned at CECOT.[5] The government accused them of being dangerous gang members.

56.     Conditions in El Salvator's prisons are "hellish", including lack of food and water, lack of medical care, and cruel, degrading, inhumane treatment sometimes amounting to torture.

57.     CECOT is a mega-prison, built to confine 40,000 people, in cells that hold 65 to 75 people each. People are crammed into cells, sharing metal bunks with no mattresses, under fluorescent lights that are on twenty-four hours a day. CECOT's Warden refused to answer journalists' questions about how many people are kept inside each cell and said only "where there's room for 10, there's room for 20 or 100."  There is no visitation of any kind at CECOT, and the Warden has boasted that "no foreign organizations or NGOs come here."

58.     CECOT prisoners are never allowed outdoors. They are  permitted only thirty minutes a day to walk through an indoor hallway, with their hands and feet shackled.

---

[5] Alison Main et al., *Trump administration deports hundreds of alleged gang members to El Salvador despite court ruling*, CNN (March 16, 2025), https://www.cnn.com/2025/03/16/politics/trump-administration-deportations-alien-enemies-act/index.html

59.     El Salvador's Minister of Justice and Public Security, Gustavo Villatoro, has stated that those held at CECOT "would never return to their communities."

60.     The Venezuelans deported to El Salvador on March 15, 2025, and subsequently imprisoned at CECOT received no notice they were being sent to El Salvador, even as they were being loaded onto the planes.

61.     As a factual matter, many of them turned out to have no gang affiliation at all. One young man was a gay makeup artist. The government insisted his two crown tattoos, symbolic of his hometown in Venezuela, made him a dangerous gang member and justified his disappearance into CECOT. Another young man disappeared into CECOT, based apparently on his tattoos, was devoted to his autistic younger brother, and had a tattoo of the autism awareness ribbon with his brother's name underneath it. He also had two others, both of words: "brothers" and "family."

62.     On March 28, 2025, Judge Brian Murphy of the United States District Court, District of Massachusetts, issued a temporary restraining order in *D.V.D. v. DHS*, a putative national class action challenging DHS's policy of deporting noncitizens to countries never previously raised as possible countries of removal without any notice or opportunity to contest removal based on a fear of persecution or torture. The temporary restraining order enjoined DHS from removing any individual subject to a final order of removal from the United States to a country other than the country designated for removal in immigration proceedings, unless and until DHS provided the individual and their counsel, if any, with written notice of the country where they may be removed to and a meaningful opportunity to submit an application for CAT protection to the

immigration court and have that application adjudicated.

63.    On Monday, March 31, 2025, Secretary of State Marco Rubio issued a

press release, stating that on Sunday, March 30, 2025, the government had "transferred"

17 more people, allegedly gang-affiliated, to CECOT.  El Salvadorian government

footage showed the men kneeling on the floor and being walked, while bent at the waist

and shackled, through the facility. Some men grunted from the exertion, one appeared to

vomit on the floor.

64.    The government refused to disclose to the media who was on the flight,

what their nationalities were, under what legal authority they had been removed, and

what their alleged crimes were. There is no publicly available information as to whether

any of the 17 people sent to CECOT were a part of *D.V.D.*'s putative class.

**III.    J.P.P.'s Case**

65.    Plaintiff J.P.P. is a citizen of Venezuela, who fled the country with his

wife and two young stepdaughters, now 12- and 16-years-old, after he was extorted,

threatened, and tortured by police in his hometown. In September 2023, J.P.P. crossed

the southern border by walking across the river and turned himself into Border Patrol,

seeking asylum.

66.    J.P.P. was released on his own recognizance with a Notice to Appear in

Denver Immigration Court in December of 2023.

67.    J.P.P. and his family rented a unit at a residential apartment complex in

Denver. He and his family felt safe there and he never observed any gang activity.

68.    When J.P.P. went to court at the appointed date, he was surprised to learn

that the Notice to Appear had never been filed with the court and he was not in removal proceedings. The immigration judge explained that he could file for asylum with USCIS.

69.     J.P.P. and his family saved their money to hire an attorney to file their application for asylum. Unfortunately, they fell victim to a notario in Miami, who prepared an application in J.P.P.'s wife's name, despite her being in removal proceedings and therefore ineligible to apply with USCIS, and listed him as a derivative. J.P.P. believed that constituted his application for asylum.

70.     The applications were mailed to USCIS before the one-year deadline and J.P.P. and his family received notice that they had an appointment to submit biometrics in early December 2024. J.P.P. was thrilled to be starting the process of seeking status in the United States.

71.     After messaging for weeks that the Venezuelan immigrant community in Aurora and Denver was a target for mass immigration enforcement, ICE and other federal agencies conducted a terrifying raid at the residential apartment complex where J.P.P. and his family lived. Around 7 am, after getting word from a neighbor in the apartment complex that ICE was going door-to-door, J.P.P. heard a commotion in the hall and went to look through the peephole to see what was happening. He saw armed, uniformed agents in helmets and bulletproof vests in the apartment across the hall.

72.     Terrified, J.P.P. ran to his children's room, where his wife had taken refuge. They decided to hide under the bed. Moments later, without warning of any kind, they heard a loud bang followed by three explosions. J.P.P. thought they were bombs. Federal agents burst into the apartment, held the family at gunpoint, and ordered them

out one by one. One agent yelled that they had a warrant signed by a judge, but did not

show it to them and did not know any of their names.

73.     J.P.P.'s wife was frantically yelling "baby, baby" in English, to try to tell

the agents they had children in the apartment. The agents placed the family in handcuffs,

moving them out to the hallway. J.P.P. and his wife were extremely distressed to see

their children in handcuffs and J.P.P.'s wife continued to try to tell the officers that the

girls were only children. Finally, a Spanish-speaking officer asked her how old the

children were. When she told him, he said coldly, "Those aren't babies."

74.     An ICE officer asked J.P.P. for his name and birthdate and then

announced he was "clear." Nevertheless, they took him into custody. At no point did

anyone explain to J.P.P. why they had raided his apartment so violently, show him the

warrant, or offer any sort of apology for their conduct.

75.     On social media, ICE Denver claimed that "100+ members of the violent

Venezuelan gang Tren de Aragua were targeted for arrest and deportation in Aurora,

Colorado today [the day of the raid.]"[6]  ICE used the alleged presence of Tren de Aragua

gang members to justify their overwhelming show of force in a complex filled with

families.[7]

76.     Media outlets later reported that only thirty people were detained, only

one of which was alleged to have gang ties, and no evidence of that tie was offered.

---

[6] ICE Denver, @ERODenver, X (Feb. 5, 2025, 9:15am)
https://x.com/ERODenver/status/1887173207536312799.
[7] ICE Denver, @ERODenver, X (Feb. 5, 2025, 9:40am)
https://x.com/ERODenver/status/1887179376430641228/video/1

77. Between February 5, 2025 and April 1, 2025, J.P.P. was never, to his knowledge, accused of being in a gang or subject to any extra security precautions that would indicate ICE believed him to be gang-affiliated. J.P.P. is not and has never been affiliated with Tren de Aragua or any other gang.

78. On February 25, 2025, J.P.P. was ordered removed as the result of a proceeding that is currently being challenged in immigration court. His Motion to Reconsider and/or Reopen is currently pending. Among other claims in that motion, he has articulated a fear of being tortured in El Salvador and asked the immigration judge to hold a hearing on it.

79. On March 15, 2025, the first planes full of Venezuelans landed in El Salvador, and the first set of deportees were disappeared into CECOT. J.P.P. watched the news coverage of this event, terrified that he too, would be sent to prison in El Salvador without any warning.

80. On April 1, 2025, J.P.P. was woken up at 3am and taken into a room in the detention facility he had never been in before, with about fifteen other people. They were told that they were scheduled to be on a "deportation flight" but there was no room.

81. Fearing a deportation to El Salvador, J.P.P.'s counsel informed ICE that she believed J.P.P. to be covered by the temporary restraining order issued in *D.V.D.* Officers said J.P.P would not be moved "today" but did not say when he would be moved or where to.

82. J.P.P. was then taken to a disciplinary unit, known in the facility as "the hole," with the other people he had been held with that morning. J.P.P. noticed that all of

the people were wearing different colored uniforms, indicating that they had come from different security levels. He was told that he would be taken somewhere tomorrow (i.e. today, April 2, 2025) but not where.

83.     J.P.P.'s counsel went to visit him in the late afternoon of April 1, 2025. She was kept waiting for several hours, but was eventually admitted because the facility "could not deny a legal visit." J.P.P. was escorted to their meeting in handcuffs, a guard on each side. This was a marked change from prior visits. Before, he had always been unshackled and unescorted, in a unit of average security.

84.     J.P.P. has never been gang-affiliated and, as far as he and his counsel are aware, has never been accused of being gang-affiliated. However, one of the guards escorting him on April 1, 2025 made a comment to his counsel about her visiting a "gang member" - a smear that completely puzzled her.

85.     ICE subsequently verbally confirmed that J.P.P. will be "transferred and staged for removal."

86.     On information and belief, ICE intends to transport J.P.P. to a third country, likely El Salvador, without legally required notice and in violation of the temporary restraining order issued in *D.V.D. v. DHS*. J.P.P. fears deportation to any third country because he may be sent back to Venezuela, where he was extorted and tortured by police. He especially fears deportation to El Salvador, where he is at risk of being smeared as a gang member, and disappeared into CECOT, a mega-prison infamous for its cruel and inhumane conditions, in a country committing unabashed and ongoing due process violations against its people, from which it is "impossible to escape."

## **CLAIMS FOR RELIEF**

### **COUNT I**
### **Administrative Procedure Act,**
### **5 U.S.C. § 706(2)(A), (C)**

87.    The allegations in the above paragraphs are realleged and incorporated herein.

88.    The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review." 5 U.S.C. § 702.

89.    The APA compels a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious, . . . otherwise not in accordance with law," *id.* § 706(2)(A), or "short of statutory right," *id.* § 706(2)(C).

90.    Defendants have a policy or practice of failing to provide noncitizens who have final removal orders with meaningful notice and opportunity to present a fear-based claim prior to deportation to a third country.

91.    Defendants' policy or practice is arbitrary and capricious. It deprives individuals with final removal orders of meaningful notice of DHS' intent to deport them to a third country and deprives them of an opportunity to present a fear-based claim to an immigration judge prior to deportation to a third country.

92.    Defendants' policy or practice is also not in accordance with law, falls short of statutory rights, and violates the INA, FARRA, and implementing regulations all of which mandate that Defendants refrain from removing Plaintiff to a third country where he will likely be persecuted and tortured, thus requiring Defendants to provide meaningful notice of deportation to a third country and the opportunity to present a fear-based claim to an immigration judge before deporting an individual to a third country, yet Defendants do not do

so.

93.     Accordingly, the Court should hold unlawful and set aside Defendants' policy
or practice of failing to provide noncitizens who have final removal orders with meaningful
notice and opportunity to present a fear-based claim prior to deportation to a third country.

94.     The Court also should order Defendants to provide Plaintiff meaningful
notice and opportunity to present a fear-based claim to an immigration judge before DHS
deports him to a third country, and subsequently provide him meaningful notice and
opportunity to apply for protection.

**Count II**
**Administrative Procedure**
**Act, 5 U.S.C. § 706(1)**

95.     The allegations in the above paragraphs are realleged and incorporated herein.

96.     The APA empowers federal courts to "compel agency action unlawfully
withheld or unreasonably delayed." 5 U.S.C. § 706(1).

97.     The INA, FARRA, and implementing regulations, and the Constitution
mandate meaningful notice and opportunity to present a fear-based claim to an immigration
judge before DHS deports a person to a third country. Defendants have unlawfully withheld
the provision of these statutory, regulatory, and constitutional rights.

98.     Accordingly, the Court should compel Defendants to provide Plaintiff with
meaningful notice and opportunity to present a fear-based claim to an immigration judge
before DHS deports him to a third country.

## Count III
## Fifth Amendment Due
## Process Clause and
## Administrative Procedure
## Act, 5 U.S.C. § 706(2)(D)

99.     The allegations in the above paragraphs are realleged and incorporated herein.

100.     The INA, FARRA, and implementing regulations mandate meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports a person to a third country.

101.     Plaintiff has a due process right to meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports him to a third country. *See, e.g.*, *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1004 (W.D. Wash. 2019). Plaintiff also has a due process right to implementation of a process or procedure to afford these protections. *See, e.g.*, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 491 (1991).

102.     By failing to implement a process or procedure to afford Plaintiff meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports him to a third country, Defendants have violated Plaintiff's substantive and procedural due process rights and are not implementing procedures required by the INA, FARRA, and the implementing regulations.

103.     Accordingly, the Court should declare that Defendants have violated Plaintiff's constitutional right to due process and that the Due Process Clause affords Plaintiff the right to a process and procedure ensuring that DHS provides meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports him to a third country.

104.     The Court should enjoin Defendants from failing to provide Plaintiff with

meaningful notice and opportunity to present a claim for protection to an immigration judge before DHS deports him to a third country.

**Count IV**
**Declaratory Judgment, 28**
**U.S.C. § 2201**

105.    The allegations in the above paragraphs are realleged and incorporated herein.

106.    Under 28 U.S.C. § 2201(a), a court "may declare the rights and other legal relations of any interested party seeking such declaration."

107.    Plaintiff seeks a declaration that the Immigration and Nationality Act, the Foreign Affairs Reform and Restructuring Act of 1998, implementing regulations, the Due Process Clause of the Fifth Amendment, and the treaty obligations of the United States require Defendants to provide meaningful notice and opportunity to present a fear-based claim to an immigration judge prior to deportation to a third country.

108.    Defendants have a policy or practice of ignoring these statutory, regulatory, and constitutional mandates.

109.    Accordingly, Plaintiff requests that the Court declare his rights and legal relations under the INA, and FARRA and implementing regulations and the Due Process Clause of the Fifth Amendment.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests that this Court:

    a.    Assume jurisdiction over this action;

    b.    Declare that Defendants have violated Plaintiff's statutory, regulatory, and constitutional rights by depriving him of meaningful notice and opportunity to

29

present a fear-based claim to an immigration judge prior to deportation to a third country;

c.  Declare that Defendants have a mandatory duty to provide Plaintiff with meaningful notice and opportunity to present a fear-based claim to an immigration judge prior to deportation to a third country;

d.  Set aside Defendants' current policy of failing to provide noncitizens like Plaintiff with written notice and a meaningful opportunity to present a fear-based claim to an immigration judge prior to deportation to a third country;

e.  Preliminarily and permanently enjoin Defendants from failing to provide Plaintiff with written notice and a meaningful opportunity to present a fear-based claim under 8 U.S.C. § 1231(b)(3) to an immigration judge prior to deportation to a third country;

f.  Preliminarily and permanently enjoin Defendants from failing to provide Plaintiff with written notice and a meaningful opportunity to present a fear-based claim under the Convention Against Torture to an immigration judge prior to deportation to a third country;

g.  Award costs and reasonable attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

h.  Order all other relief that the Court deems just and proper.

Respectfully submitted,

_s/Emma Mclean-Riggs_                    Elizabeth Jordan
Emma Mclean-Riggs                       **Immigration Law & Policy Clinic**
Anna I. Kurtz                           University of Denver Sturm College of Law

Sara R. Neel
**American Civil Liberties Union**
**Foundation of Colorado**
303 E. 17th Avenue
Denver, CO 80203
(720) 402-3114
emcleanriggs@aclu-co.org
akurtz@aclu-co.org
sneel@aclu-co.org

2255 East Evans Avenue, Suite 335
Denver, CO 80210
(303) 871-6368
elizabeth.jordan@du.edu

*Attorneys for Plaintiff*

Date: April 2, 2025